IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

JACOB BLAKE, JR.

      Plaintiff,

    v.                               Case No.

CITY OF KENOSHA,                  JURY TRIAL DEMANDED
RUSTEN SHESKEY in his individual capacity,
BRITTANY MERONEK in her individual capacity,
VINCENT ARENAS in his individual capacity,
DANIEL G. MISKINIS, in his individual and official
capacity as the former Chief of Police for the
Kenosha Police Department,　and John Doe
Officers,

      Defendants.
_____

**COMPLAINT**
_____

NOW COMES the Plaintiff, JACOB S. BLAKE, JR., by and through his attorneys, and respectfully allege for their Complaint and Jury Demand as follows:

## I.     INTRODUCTION

On August 23, 2020 twenty-nine year old Jacob Blake, Jr. was shot by Kenosha Police Department ("KPD") Officer Rusten Sheskey seven times in the City of Kenosha. This complaint tells the story of how this avoidable tragedy led to irreparable harm to Mr. Blake due to a culture of policing that validated the excessive force which he was a victim of.

## II.     JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant 28 U.S.C. §§1331 and 1343(a).

2. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and the laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

3. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred in this District.

## III.     PARTIES

4. Plaintiff, JACOB S. BLAKE, JR. (hereinafter Plaintiff BLAKE) was, at all relevant times, a resident of Kenosha, Wisconsin.

5. The City of Kenosha is and was at all material times, a municipality and political subdivision of the county of Kenosha, state of Wisconsin, organized pursuant to Chapter 59 of the Wisconsin Statutes, and existing under and by virtue of the laws of Wisconsin.

6. Defendant OFFICER RUSTEN SHESKEY was, at all relevant times, a Kenosha Police Officer employed by the City of Kenosha, who was acting under color of state law and within the scope of his employment, he is being sued in his individual capacity.  It should be noted that Defendant Sheskey was sued for Excessive Force in case 21CV00381 in the Wisconsin Eastern District Court.  On May 6, 2022 the parties signed a stipulation to dismiss with prejudice the excessive force  claim against Defendant Sheskey. 21CV 00381 ECF 32.

7. Defendant OFFICER BRITTANY MERONEK was, at all relevant times, a Kenosha Police Officer employed by the City of Kenosha, who was acting under color of state law and within the scope of her employment, she is being sued in his individual capacity.

8. Defendant OFFICER VINCENT ARENAS was, at all relevant times, a Kenosha Police Officer employed by the City of Kenosha, who was acting under color of state law and within the scope of his employment, he is being sued in his individual capacity.

9. Defendant DANIEL G. MISKINIS was the Chief of Police for the Kenosha Police Department at all times relevant. Defendant Miskinis had the authority to make and enforce policies of the Kenosha Police Department for all times relevant to this complaint. Mr. Miskinis is sued in his individual and official capacities.

10. Defendants JOHN AND JANE DOE POLICE OFFICERS are unknown law enforcement officers employed by Defendant Kenosha Police Department.

IV.   FACTS

Upon information and belief Plaintiff Jacob Blake, Jr. asserts the following facts in Paragraphs 11 – 65 below.

11. At all times relevant hereto, Plaintiff, BLAKE was a father of two children who worked as an armed security guard in Illinois.

12. On August 23, 2020, Plaintiff BLAKE attended a gathering of friends and family to celebrate his son's eighth birthday in Kenosha at the invitation of Laquisha Booker, the mother of one of his children who lived at the address.

13. Following a verbal dispute between Booker and a female neighbor, Plaintiff BLAKE

14. chose to leave the area with two of his sons to avoid the confrontation between the two women.

15. At approximately 5:11 p.m., Booker called the Kenosha police and related, *inter alia*, that she had allowed him to come to the residence but that he "wasn't supposed to be there."

16. Defendant SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS were subsequently dispatched to the location for what was initially termed as "family trouble."

17. Within three minutes, Defendant SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS arrived at the location as Plaintiff BLAKE was putting one of his sons into the backseat of a Dodge SUV.

18. Upon arrival, Defendant SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS approached Plaintiff BLAKE. Without announcing any intention to arrest Plaintiff BLAKE and in the absence any verbal commands to place his hands behind his back to be handcuffed, Defendant SHESKEY with the assistance of MERONEK, and ARENAS grabbed Plaintiff BLAKE by the wrist and began to apply physical force to his arm as he was in the process of placing one of his sons into the back of the SUV.

19. Believing he was about to be attacked by the police, Plaintiff BLAKE tensed up his arm and attempted to maintain his balance by putting his hands on top of the car.

20. Immediately, Defendant SHESKEY, MERONEK, and ARENAS to physically attack

21. Plaintiff BLAKE by placing BLAKE in a headlock, punching and choking him, and shocking him with a taser on three occasions.

22. Plaintiff BLAKE struggled to his feet to get up off the ground, he retrieved a folding utility knife off the ground that he had previously dropped.

23. Plaintiff BLAKE began to walk away from the officers to the front of the vehicle, until he reached the driver's side door and placed his left hand on the door handle.

24. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Plaintiff BLAKE attempt to run from the officers.

25. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Plaintiff BLAKE attempt to strike any of the officers.

26. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Plaintiff BLAKE attempt to verbally or physically threaten the officers.

27. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Plaintiff BLAKE attempt to verbally or physically threaten anyone present on the scene.

28. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver 's side door did Plaintiff BLAKE make any abrupt physical gestures.

29. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Plaintiff BLAKE turn to face the officers or otherwise initiate any type of physical confrontation.

30. As Plaintiff BLAKE walked around to the driver's side of the SUV, Defendants

SHESKEY, ARENAS, and MERONEK followed him with their guns drawn and pointed at BLAKE.

31. At no time from the point at which Plaintiff BLAKE began to walk away from the officers until the time he reached the driver's side door did Defendant SHESKEY, ARENAS, MERONEK, and other JOHN DOE OFFICERS feel that Plaintiff BLAKE posed a threat to him.

32. Once Plaintiff BLAKE reached the driver's side door of the SUV, he began to open the door with his left hand.

33. As Plaintiff BLAKE opened the door of the SUV, Defendant SHESKEY grabbed Plaintiff BLAKE'S t-shirt and began to pull him backwards, while Defendants MERONEK and ARENAS had their guns drawn and pointed at BLAKE.

34. At the point at which Plaintiff BLAKE began to open the driver 's side door of the SUV, there were multiple civilians in the immediate vicinity, including women and a toddler standing on the parkway within feet of the SUV.

35. At the point at which Plaintiff BLAKE began to open the driver 's side door of the SUV, two of Plaintiff BLAKE'S young children – ages 5 and 8 – were in the back seat.

36. As Plaintiff BLAKE opened the driver 's side door, he felt Defendant SHESKEY grab his t- shirt and pull him backwards as he was attempting to sit down inside the SUV.

37. As Plaintiff BLAKE opened the driver 's side door, right hand and arm of Plaintiff BLAKE was fully visible to Defendants SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS at the time Plaintiff BLAKE opened the door.

38. The movement of the right hand and arm of Plaintiff BLAKE was fully visible to Defendant SHESKEY, ARENAS, MERONEK, and JOHN DOE OFFICERS at the time Plaintiff BLAKE attempted to sit down in the SUV.

39. The movement of the body of Plaintiff BLAKE in a downward and away position into a sitting position in the driver's seat of the SUV was fully visible to Defendants SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS.

40. The action of Plaintiff BLAKE throwing the folding knife onto the floorboard of the SUV was fully visible to Defendants SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS.



41. At the moment when Plaintiff BLAKE threw the knife to the floor, his left hand was still on the exterior door handle, while his right hand and arm were visibly extended in plain sight away from Defendants SHESKEY, MERONEK, ARENAS, and JOHN DOE OFFICERS.

42. After Plaintiff BLAKE had thrown the knife to the floor in full view of Defendants SHESKEY MERONEK, ARENAS, and JOHN DOE OFFICERS, Defendant SHESKEY continued to pull back on the t-shirt of Plaintiff BLAKE with one hand and fired his semi-automatic pistol with the other.

43. At a time when Plaintiff BLAKE had visibly dropped the folding knife in full view of the officers, Defendant SHESKEY fired a total of seven shots at point blank range, while Defendants MERONEK and ARENAS had their guns drawn and pointed at BLAKE.

44. At the time of the first shot, Plaintiff and Defendants SHESKEY and ARENAS were positioned as follows:



45. At the time of the second shot, Plaintiff BLAKE and Defendants SHESKEY and ARENAS were positioned as follows:



46. At the time of the third shot, Plaintiff BLAKE was seated with his right foot completely in the SUV as Defendant SHESKEY continued to shoot and as Defendants ARENAS, MERONEK, and JOHN DOE officers had their weapons drawn and pointed at BLAKE, Plaintiff BLAKE was inside the vehicle. The position of BLAKE, SHESKEY, and ARENAS were as follows:



47. At the time of the fourth shot, Plaintiff BLAKE remained seated, with both feet inside the SUV as Defendant SHESKEY continued to shoot, Defendants ARENAS and MERONEK had their guns drawn and pointed their weapons at him. The positions of Plaintiff BLAKE and Defendants SHESKEY and ARENAS were as follows:



48. At the time of the fifth shot, Plaintiff BLAKE and Defendants SHESKEY and ARENAS were positioned as follows:



49. At the time of the sixth shot, Plaintiff BLAKE and Defendants SHESKEY and ARENAS were positioned as follows:



50. At one point during the course of firing the seven shots, Defendant SHESKEY stopped looking at Plaintiff BLAKE and turned his head to his left while still firing his weapon, while Defendant ARENAS and MERONEK had their guns pointed at BLAKE.

51. At the time of the seventh shot, Plaintiff BLAKE and Defendants SHESKEY and

ARENAS were positioned as follows:



52. Throughout the entire course of all seven shots being fired, Plaintiff BLAKE was moving away from – and not towards – Defendants SHESKEY, ARENAS, MERONEK, or JOHN DOE OFFICERS into a seated position, as evinced by the fact that the t-shirt Plaintiff BLAKE was wearing was continuously stretched by Defendant SHESKEY'S grasp of it, even after the seventh shot occurred.

53. At the time Defendant SHESKEY fired all seven shots and while Defendants ARENAS, MERONEK, and JOHN DOE officers had their guns pointed at BLAKE as well as the vehicle, two of Mr. Blake's kids were seated inside the car.

54. At the time Defendant SHESKEY fired all seven shots and while Defendants ARENAS, MERONEK, and JOHN DOE officers had their guns drawn and pointed, at least four women and one toddler stood on the opposite side of the SUV and were in imminent danger from being hit by gunfire and/or ricocheting bullets or fragments thereof. The position of these bystanders at the time the gunfire had commenced is as follows:



55. At the time Defendant SHESKEY fired all seven shots, he held the muzzle of his weapon only a few feet away from where Plaintiff BLAKE'S two young children sat, placing them in imminent danger from being hit by gunfire and/or ricocheting bullets or fragments thereof.

56. At the time Defendant SHESKEY fired all seven shots, Defendants ARENAS, MERONEK, and JOHN DOE officers had their guns drawn and pointed at various times at Plaintiff BLAKE and the vehicle where Plaintiff BLAKE'S two young children sat, placing them in imminent danger from being hit by gunfire and/or ricocheting bullets or fragments thereof.

57. At least one of the shots from Defendant SHESKEY'S gun was fired directly into the side of the SUV and at an angle toward where the children sat in the rear seats. This bullet ricocheted and landed outside the driver's door of the SUV.



58. But for the fact that a second layer of steel absorbed the bullet fired into the door of the SUV, the bullet would have continued in its path through the driver's seat and into the rear passenger compartment where the children sat. The front and side views of the driver's side of the SUV where the ricocheting bullet was fired is depicted below:



59. The bullets Defendant SHESKEY fired from his Glock 17 semiautomatic pistol into the side of the car and the body of Plaintiff BLAKE were 9-millimeter Hornaday Luger rounds, a type of hollow point bullet with a polymer tip designed to expand upon entry into its target in order to inflict the maximum amount of damage to bone and tissue.

60. Six of the seven rounds fired by Defendant SHESKEY ripped into the arms, back and left side of Plaintiff BLAKE'S body as he sat down in the driver's seat of the SUV. Some rounds fragmented after impacting Plaintiff BLAKE'S body.

61. The fusillade of bullets that Defendant SHESKEY fired into the body of Plaintiff BLAKE caused catastrophic injury and paralysis. At least one round fired by Defendant SHESKEY ripped through the spinal column of Plaintiff BLAKE, severing his spinal cord and instantly rendering his fully seated body limp upon impact.

62. After shooting Plaintiff BLAKE, Defendants SHESKEY, ARENAS, MERONEK and JOHN DOE officers who were at the scene were not interviewed by investigators for two, or in some cases, three days, and only after they had conferred extensively with attorneys and union representatives as to what the claimed justification would ultimately be for shooting Plaintiff BLAKE seven times in front of his children.

63. Defendants SHESKEY, ARENAS, MERONEK, and JOHN DOE officers refused to have any aspect of the interview recorded and none of their statements given were made under oath. In fact, some of the officers in an effort to conceal material evidence and avoid making any statements that might compromise Defendants SHESKEY, ARENAS, MERONEK, and JOHN DOE officers on the scene, some

officers deactivated their audio microphones in the aftermath of the shooting and/or cautioned each other to remain silent.

64. By contrast, the first interview of Plaintiff BLAKE occurred within hours of the shooting when DCI agents appeared next to his ICU hospital bed at a time when he was heavily sedated and in intractable pain. Believing that the entire incident would have been captured on body cam video, he urged DCI investigators to "look at the video" to confirm that he had indeed thrown the knife to the floor of the car as he was sitting down and prior to being shot by Defendant SHESKEY.

65. As a direct and proximate result of the Defendant's misconduct as fully detailed herein, PLAINTIFF suffered grave physical and psychological injuries that included physical harm from six gunshot wounds, permanent paralysis, disfigurement and disability, as well as great mental anguish, humiliation, degradation, loss of reputation and anxiety.

## V.    BACKGROUND

Upon information and belief Plaintiff Jacob Blake, Jr. asserts the following background information in Paragraphs 66 through 72 below.

66. In 2020, the City of Kenosha was the recipient of numerous federal grants that was used for its police department.

67. Defendant City of Kenosha through its police department has a history of systemic, racially discriminatory policies and practices.

68. In Kenosha, while 89% of police officers are white, compared to 67% of residents. Only 3% of Kenosha's cops are Black, compared to about 12% of its residents.

69. At the time of this incident the KPD had just eight Black police officers, out of a force of more than 200 officers. It had never had a Black person in top leadership positions, including police chief, assistant chief, or police inspector.

70. Christopher Carter, a former Black police officer in the KPD who retired in 2011, has said he was consistently subject to racist aggression, including being called a "n*****," was discriminated against during his time at the KPD, and witnessed racist policing practices toward civilians.

71. In an article in the Washington Post, six current and former officers "described a department at odds with people of color, both inside and outside its ranks, with some officers routinely using racist language and excessive force." One of the former officers stated, "You have officers there who openly admit to pulling someone over because they're Black and driving a nice car. And these are officers who train new officers."

72. Just eleven days before Jacob Blake was shot, a woman was arrested for filming police officers engaging in threats and physical abuse during the arrest of a Black man. Her video footage captured a KPD officer punching a man in the ribs twice after he had already been handcuffed. When she was ordered to disperse, she responded, "We're not moving until we know he's safe!" An officer responded, "Do you want to get shot?"

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**
**Against City of Kenosha and as referred to in this Claim "Defendant Officers"**
**Brittany Meronek, Vincent Arenas, and John Doe Officers**

73. Plaintiff BLAKE re-alleges paragraphs 1 through 75 as if fully restated herein.

74. As a citizen of the United States, BLAKE is protected against the use of excessive

and deadly force without cause or justification as guaranteed by the Fourth Amendment to the United States Constitution.

75. Upon information and belief, As more fully described in the preceding paragraphs, the intentional conduct of Defendants Meronek, Arenas, and John Doe Officers was objectively unreasonable and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

76. Upon information and belief, the misconduct described above was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff BLAKE.

77. Upon information and belief, BLAKE suffered catastrophic, permanent injuries as a result of the hereinafter actions of Rusten Sheskey,[1] Defendants Meronek, Arenas, and John Doe officers use of force was also objectively unreasonable.

78. Upon information and belief, as a direct and proximate result of the use of excessive force by Sheskey and Defendants Meronek, Arenas, and John Doe Officers, Plaintiff BLAKE has suffered and will continue to suffer physical and emotional damages which will be proven at trial.

79. At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the KPD.

80. Upon information and belief, Defendant Officers use of excessive force as

---

[1] It should be noted that Defendant Sheskey previously was sued for Excessive Force in case 21-CV-0381 in the Eastern District of Wisconsin.  On May 6, 2022 the parties to that lawsuit signed a stipulation to dismiss with prejudice the excessive force claim against Defendant Sheskey. Officer Sheskey is not a Defendant for Claim 1.  ECF 32.

described herein was objectively unreasonable and excessive in light of the facts and circumstances confronting him at the time.

81. Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiff Blake, Jr. had a clearly established constitutional right to be secure in his person against unreasonable seizures through the use of excessive force.

82. Upon information and belief, under the application of the specific facts and totality of circumstances as described herein, Defendant Officers and the City violated Mr. Blake's clearly established constitutional rights.

83. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of the incident.

84. Upon information and belief, Defendant Officers did not have a valid legal basis to seize Mr. Blake by tasing him and shooting at him eight times.

85. Upon information and belief, Defendant Officers seized Mr. Blake by means of objectively unreasonable and excessive force when he had no reasonable belief that Mr. Blake had committed or was going to commit a crime or posed a threat to any officer or other person.

86. Upon information and belief Defendant officers engaged in the use of excessive force that was objectively unreasonable in light of the facts and circumstances, violating Mr. Blake's Fourth Amendment rights.

87. Upon information and belief, any reasonable officer in his position should have known that it was unreasonable to use the amount and type of force used and that to do so would violate Mr. Blake's clearly established constitutional rights.

88. Upon information and belief, any reasonable officer in his position should have known that it was unreasonable to intentionally tase Mr. Blake numerous times with the express intention to substantially harm him and that to do so would violate Mr. Blake's clearly established constitutional rights.

89. Upon information and belief, Defendant Officers excessive force caused Mr. Blake to be unlawfully seized and thereby caused his injuries.

90. Upon information and belief, Defendant Officer's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Blake's federally protected rights and he engaged in these actions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Blake's constitutionally protected rights.

91. The acts of Defendant Officers were pursuant to the customs, practices, policies, and/or training of Defendant City of Kenosha.

92. Upon information and belief, as alleged in detail above, Defendant Kenosha through its policymaker, Defendant Miskinis, had a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by Defendant Officers. This is manifested through, among other things, KPD's grossly inadequate training, supervision, and discipline of Defendant John Doe Officers relating to the use of excessive force.

93.   Upon information and belief, Defendants Miskinis and Kenosha were on notice of KPD's defective customs, policies, and/or practices before Defendant John Doe Officer's excessive use of force against Mr. Blake.

94.  Upon information and belief, the need for adequate mental health evaluations, effective policies related to officer involved shootings, adequate hiring procedures, additional and effective use of force policies, training, and/or supervision was obvious and Defendants Kenosha and Miskinis exhibited deliberate indifference to the known and substantial risk of harm to Mr. Blake and others by failing to create adequate mental health evaluation policies, effective policies related to officer-involved shootings, adequate hiring procedures, and adequate use of force policies and/or to adequately train or supervise KPD officers in the use of force.

95. Defendants Miskinis and Kenosha's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise KPD officers in the use of force was substantially certain to cause KPD officers to violate the constitutional rights of individuals like Mr. Blake to be free from excessive force and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise KPD officers in the use of force. These acts and/or omissions constituted a deliberate choice by Miskinis and Kenosha among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

96. Upon information and belief, Defendants Miskinis and Kenosha set in motion a series of events they knew would cause Mr. Blake, or an individual in a similar situation as Mr. Blake, to be deprived of his constitutional right to be free from excessive force.

24

97. Upon information and belief, but for the above acts or omissions of Miskinis and Kenosha, Defendant Officers would not have violated Mr. Blake's constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants Miskinis and Kenosha's acts and omissions.

98. Upon information and belief, the herein described acts or omissions of Defendant Kenosha, Defendant Miskinis, and Defendant Officers were the moving force behind the violation of Mr. Blake's constitutional right to be free from excessive force and proximate cause of Plaintiff Blake's significant injuries, damages, and losses.

99. Upon information and belief, the herein described acts or omissions of the Defendant Kenosha, Defendant Miskinis, and Defendant Officers were the moving force and the legal, direct, and proximate cause of Plaintiff injuries and losses, including but not limited to Mr. Blake's physical and mental pain and anguish suffered before, during, and after the incident; the loss of Mr. Blake's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Blake's lost earnings and earnings capacity, medical bills, and funeral expenses.

100. Upon information and belief, the intentional actions or inactions of Defendants Kenosha, Miskinis, and Officers, as described herein, intentionally deprived Mr. Blake of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Failure to Train and Supervise
### Against City of Kenosha and Defendant Miskinis

101. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

102. Defendant Officers and Kenosha violated Mr. Blakes' constitutional right to be free from excessive force resulting in his injuries, as set forth in the First Claim for Relief.

103. Defendant Miskinis was, at all times relevant, a policymaker or final delegated decision-maker for the Kenosha Police Department, and in that capacity established policies, procedures, customs, and/or practices for the same.

104. At all times relevant hereto, it was known to Defendants that it was highly probable that Kenosha law enforcement officers would encounter citizens suffering from mental illness and that citizens suffering from such disorders are at a highly elevated risk of injuries from ordinary law enforcement use of force methods to restrain non-compliant persons.

105. Defendants were required to implement policies and train their officers with respect to dealing with persons who are mentally ill or emotionally disturbed including but not limited to: requesting backup from people with experience; training not to unreasonably agitate or excite the person; to contain the person; to respect the person's comfort zone; to use nonthreatening communications, and; to employ the passage of time to their advantage.

106. Upon information and belief, at all times material hereto, Defendants did not have specific policies, procedures and training governing law enforcement

response to citizens suffering from such mental conditions and did not train all of their law enforcement officers on what uses of force with respect to such citizens were reasonable and constitutional and were, therefore, deliberately indifferent to the constitutional rights of such medically and/or mentally impaired citizens.

107.    Defendants Kenosha and Miskinis also knew that absent the adoption of specific policies, procedures and tactics governing law enforcement response to citizens suffering from mental illness, and absent training of law enforcement officers in such policies, procedures and tactics, it was highly predictable that such failures to train would lead to law enforcement officers' violation of the Fourth Amendment Rights of citizens, and could likely result in the otherwise avoidable injuries of such citizens.

108.    This deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

109.    In light of the duties and responsibilities of those police officers that participate in interactions, arrests, or other dealings with mentally ill or emotionally disturbed individuals, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights in these recurring situations, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

110.     Defendants Kenosha and Miskinis knew or should have known that police employees would use unreasonable force when dealing with mentally ill, emotional disturbed individuals, or highly agitated individuals.

111.     Defendants Kenosha and Miskinis were deliberately indifferent to the constitutional rights of mentally disturbed and intoxicated individuals in the public, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Blake) by failing to properly train and supervise his employees. Defendants could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

112.     The reckless and deliberately indifferent acts and omissions of Defendants in the training and supervision of its officers, as described herein, were moving forces in the predictable deprivation of Plaintiff's constitutional rights.

*113.*     As a proximate result of Defendants' unlawful conduct, Plaintiff Blake has suffered injuries and losses, entitling it to recover compensatory and special damages, including loss of constitutional rights, pain and suffering during this event, lost earnings, permanent lost earnings and earnings capacity for the expected productive working lifetime of Jacob Blake all in amounts to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Denial of Equal Protection**
**Against Defendant City of Kenosha and as referred to in this Claim**
**"Defendant Officers" Rusten Sheskey, Brittany Meronek, Vincent Arenas,**
**John Doe Officers**

*114.*     Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

115.     At all times relevant to the allegations in this Complaint, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983, were acting under color of state law, and were acting within the scope of their official duties and employment in their capacities as officers of the KPD.

116.     At the time of the events at issue, Mr. Blake had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

117.     Upon information and belief, Mr. Blake's race was a motivating factor in Defendant Officer's decision to seize him and to use excessive force against him. Defendant Officers acted with the intent or purpose of depriving Mr. Blake of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

118.     Upon information and belief, Defendant Officers treated Mr. Blake less favorably—and with unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black.

119.     Upon information and belief, there was no rational basis for Defendant Officers discriminatory actions and inactions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

120.     Upon information and belief, Defendant Officers seized and used excessive force against Mr. Blake without reasonable suspicion or probable cause to believe that Mr. Blake had committed a crime, posed a threat of harm to any other person, or was a flight risk that would legally justify the force used. The lack of any such reasonable suspicion or probable cause, along with KPD's long history of racially

biased policing, are evidence that the seizure of Mr. Blake by Defendant Officers use of force against him was motivated in whole or in part because of Mr. Blake's race.

121. Upon information and belief, KPD officers' history and disproportionate use of excessive force against Black people provide evidence of discriminatory intent. KPD's clear pattern of disproportionate use of excessive force against Black people is unexplainable on grounds other than race.

122. Upon information and belief, Defendants Officers intentionally, willfully, unreasonably, and wantonly seized Mr. Blake by using excessive force against him, and/or failing to intervene in the use of excessive force against him, wholly or in part because of his race.

123. Upon information and belief, Defendant Sheskey, Arenas, Meronek, and John Doe Officers actions were objectively unreasonable considering the facts and circumstances confronting them.

124. Upon information and belief, Defendant Officers engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Blake's federally protected constitutional rights.

125. Upon information and belief, Defendants Kenosha and the chief policymaker, Miskinis, failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the Defendant Officers unlawful seizure via the use of excessive force against Mr. Blake. Defendants Kenosha and Miskinis particularly

failed to properly train, supervise, and/or discipline its employees regarding the use of excessive force against Black people, and the prohibition on using race as a motivating factor in taking police actions, including the use of force.

126.    Upon information and belief, Kenosha's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Kenosha.

127.    Upon information and belief, considering the duties and responsibilities of personnel of Defendant Kenosha — who must police and interact with Black people regularly—and the frequency with which such law enforcement personnel will confront Black people while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Kenosha is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

128.    Upon information and belief, such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Defendant Officers racially biased treatment of Mr. Blake, and makes up an unconstitutional policy, procedure, custom, and/or practice.

129.    Upon information and belief, Kenosha exonerated Defendant Officers for their racially biased conduct under Kenosha's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Kenosha's

longstanding customs and practices. The decision sends a clear message that Defendant Officers acted pursuant to the customs, practices, and policies of Defendant Kenosha.

130.     Upon information and belief, Defendant Kenosha's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of Mr. Blake's injuries.

131.     Upon information and belief, as a direct and proximate result of Defendants' actions, Mr. Blake was substantially injured and has been and continues to be damaged by Defendant Officers racially motivated seizure via unreasonable use of excessive force. Mr. Blake endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life at the age of 25.

132.     Upon information and belief, the herein described acts or omissions of Defendant Kenosha, Miskinis, and Defendant Officers, were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to Mr. Blake's injuries, the physical and mental pain and anguish Mr. Blake suffered before and during his injuries, the loss of Mr. Blake's constitutional rights, his loss of enjoyment of life, and other compensatory and special damages including but not limited to Mr. Blake's permanent lost earnings and earnings capacity, medical bills, and funeral expenses.

*133.*    Defendants' intentional actions or inactions as described herein intentionally deprived Mr. Blake of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**U.S.C. § 1983 – Failure to Protect**
**Against as referred to in this Claim "Defendant Officers" Rusten Sheskey,**
**Brittany Meronek, Vincent Arenas, John Doe Officers**

134.    Plaintiff Blake realleges and incorporates each preceding paragraph of this Complaint as if fully restated herein.

135.    Upon information and belief, Defendants Officer's failed to protect Blake from serious harm by deliberately disregarding established police procedures and training specifically as it relates to use of force, which resulted in Blake's injuries.

136.    Upon information and belief, Defendant Officers failed to take corrective action to ensure the safety and security of Blake, by failing to ensure that Blake was treated appropriately in line with police training and procedures as it relates to use of force which resulted in Blake's injuries.

**137.**    Upon information and belief, as a result of Defendants' intentional failure to Plaintiff Blake suffered damages in the form of injuries, attorney fees and costs, and other damages that will be established at trial.

**Fifth Claim for Relief**
**Wisconsin Statute Section 895.46**
**Indemnification against Kenosha**
**Against All Defendants**

138.    Plaintiffs reallege and incorporate by reference the allegations of all the preceding paragraphs.

139.     Upon information and belief, at all times material hereto, Defendant Officers were carrying out duties as KPD officers and were acting within the scope of their employment with Kenosha.

140.     Upon information and belief, the conduct of Defendant Officers, as set forth in the preceding paragraphs resulted in the injuries to Plaintiff Blake.

141.     Upon information and belief, Kenosha is liable, pursuant to Wisconsin Statute Section 895.46 for any judgment entered against Defendant Officers in this action because at all times material hereto, Defendant Officers was carrying out his duties as a KPD officer and was acting within the scope of his employment with Kenosha.

142.     Upon information and belief, Defendant's Miskinis investigation and lack of any disciplinary actions were not complete and incompetent and/or constitute an attempted cover up Defendants Officer's unlawful conduct.

143.     Upon information and belief, the acts of Defendant Officers including shooting Mr. Blake without any justification or reasonable suspicion, was done in accordance with the Kenosha and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force in executing arrests, false arrests, and/or otherwise violating  person's equal protection rights, including by the City's or in this case to date, Defendant Miskinis and Kenosha's, failure to adequately discipline Defendant Officers for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by the Kenosha, through its Chief of Police Miskinis, and as such constitute a de-facto governmental custom in such department, even though

such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate KPD's written policies.

144.     Upon information and belief, this official or de facto policy or custom of utilizing excessive force, lethal force, and/or violating person's equal all in malicious or reckless disregard or with deliberate indifference to Mr. Blake's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Miskinis's failure to adequately discipline Defendant Officers for their unlawful conduct and for Defendant's Miskinis continued failure to adequately supervise Defendant Officers.

145.     Upon information and belief, that this official or de-facto policy and custom of utilizing excessive force, lethal force, and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others, Kenosha and the KPD's failure to adequately supervise, discipline, and/or train its employees namely Defendant Officers.

146.     Upon information and belief, that the described conduct on the part of all the Defendants, including the former chief of Police for the KPD Defendant Miskinis, in his official capacity, was a cause of the plaintiff's injuries, losses and damages as set forth herein.

147.     Upon information and belief, that such conduct was intended to cause Mr. Blake unnecessary and severe physical, psychological, and emotional injuries that resulted in his injuries.

148. Upon information and belief, that such conduct on the part of all the individual Defendants was a cause of the Mr. Blake's injuries and causing also severe psychological and emotional damages, suffered by the petitioners.

149. Upon information and belief, at all times material hereto, the individual Defendants acted maliciously and/or with reckless disregard and/or with deliberate indifference towards Mr. Blake or in an intentional disregard of his rights, his life and as such all Defendant's should be liable for any and all punitive damages suffered by petitioners.

150. Upon information and belief, Defendant Kenosha is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against this individual employee Defendant in this action because said Defendant was acting within the scope of his employment when he committed the acts described above.

**JURY DEMAND**

Plaintiff BLAKE, hereby demands a trial by jury pursuant to Federal rule of Civil Procedure 38(b) on all issues so triable.

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

1. For damages in an amount to be determined at trial;

2. For attorney's fees pursuant to 42 U.S.C § 1988;

3. For all costs and fees incurred in bringing this suit; and,

4. For such other and further relief as the Court deems proper.

Dated this 23rd day of August, 2023.

**MOTLEY LEGAL SERVICES**
Attorney for Plaintiff

By:     *Electronically signed by Kimberley Cy. Motley*
        Kimberley Cy. Motley, SBN 1047193
        PO Box 1433
        Matthews, NC 28106
        P: (704) 765-4887
        F: (704) 582-6229
        E: kmotley@motleylegal.com

**LAW OFFICE OF ANGELA D. CUNNINGHAM, LLC**
Attorney for Plaintiff

By:     *Electronically signed by Angela D. Cunningham*
        Angela D. Cunningham, SBN 1092034
        9000 W Chester Street, Suite 100
        Milwaukee, WI 53214
        P: (414) 485-5683
        E: angela@adclawoffice.com